UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-60036-CIV-GOLD/DUBÉ

DONNA M. DANIELS,

      Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

                            /

## REPORT AND RECOMMENDATION

THIS CAUSE is before this Court on the Motion for Summary Judgment filed by the

Plaintiff (D.E. #14) and the Motion for Summary Judgment filed by the Defendant (D.E. #17)

pursuant to an Order of Reference entered by the Honorable Alan S. Gold, United States District

Judge. The issue before the Court is whether the record contains substantial evidence to support the

denial of benefits to the Plaintiff, Donna M. Daniels (hereinafter "Daniels" or "Plaintiff").

## I. FACTS

Daniels filed an application for Disability Benefits on February 5, 2003. (R. 27-29).[1] The

application, which asserted disability as of June 2, 2002, was denied initially and on reconsideration.

(R. 17-18, 22-23). Following a hearing (R. 572-596), the ALJ issued a decision denying the request

for benefits. (R. 6H-6X). A request for review filed with the Appeals Council was denied. (R. 6A-

6C).

The Plaintiff, age 47 at the time of the hearing on November 30, 2005, testified that she

---

[1] All references are to the record of the administrative proceeding filed as part of the Defendant's answer.

completed the eleventh grade. (R. 575). The Plaintiff described her prior work as a manager at a tanning salon, in accounts receivable in a flower store, and an owner of a candy store/arcade. (R. 577-578). She testified that her last job was at the tanning saloon. (R. 577). Daniels indicated that she stopped working due to injuries to her neck, lower back, and head which were caused after falling off a ladder while at work. (R. 579).

The Plaintiff testified that she takes Zoloft, Geodon, and Cymbalta to treat her depression; and Ambien for insomnia. (R. 584). According to the Plaintiff, she "just didn't feel right anymore after the accident." (R. 583). Daniels testified that she attempted to commit suicide at some point in 2002 or 2003. (R. 585-586). She also testified that she gets confused, has short term memory loss, and cannot sleep at night. (R. 586-587). The Plaintiff stated that her depression medication helps. (R. 586).

Daniels stated that the pain at the time of the hearing was worse than when she was initially injured. (R. 588). The Plaintiff said that she lays on the hard floor to relieve her pain. (R. 588). Daniels testified that she can only sit for a half an hour; stand for half an hour; and cannot do too much walking even though the doctor recommended it as an exercise. (R. 589). According to the Plaintiff, sitting is easier because she can switch from side to side. The Plaintiff stated that she could probably lift/carry ten pounds. (R. 590).

The Plaintiff stated that she could not do household chores, bend, kneel, or stoop as each of these activities cause too much pain. (R. 590). She also testified that she spends the majority of her day watching television. (R. 591). Daniels stated that she drives on occasion in order to go to a CVS or Winn-Dixie. (R. 591).

In addition to the testimony presented at the hearing, medical records were submitted to the

2

ALJ. A CT scan of the Plaintiff's brain taken on June 2, 2002 was normal. (R. 112). A CT scan of the cervical spine taken on the same day was negative. (R. 113). X-Rays of the cervical and lumbar spine, chest and right ankle were also taken on June 2, 2002 and the results were normal. (R. 114-116).

The Plaintiff visited with Dr. Jeffrey T. Haimes on June 17, 2002. (R. 122). During that visit the Plaintiff complained of headaches, lower back pain, and neck pain. (R. 122). Results of a physical exam showed:

> tenderness over the paraspinal cervical musculature bilaterally as well as the trapezius bilaterally. There is also decreased sensation along the left trapezius. There is some tenderness over the rhomboid major and minor bilaterally and over the thoracic spine spinous processes proximally. There is also tenderness over the paraspinal lumbosacral musculature and over the left SI joint as well as the left lumbosacral spine paraspinal musculature.

(R. 122). Additionally, the examination revealed normal motor strength in the arms and legs. (R. 122-123). Further, sensation symmetrical to touch in the C6, C7, and T1 nerve distributions. (R. 122). "Decreased sensation in the small finger, i.e., C8 nerve distribution, and the lateral aspect of the humerus and the C5 nerve distribution, decreased on the left when compared to the right." (R. 122). The impression was:

> 1. Cervical strain and sprain. Rule out herniated nucleus pulposus.
> 2. Closed head injury.
> 3. Lumbosacral spine strain and sprain. Rule out herniated nucleus pulposus.

(R. 123).

On June 27, 2002, the Plaintiff returned to Dr. Haimes and an MRI taken of the cervical spine revealed a disc bulge at C4-5, and a protruding disc at C5-6. (R. 121).

On August 29, 2002, Daniels visited Dr. Haimes with complaints of neck pain, mid back pain,

3

lower back pain, and pain in her right shoulder. (R. 119). The physical examination showed tenderness with no muscle spasms along with difficulty in the internal and external rotation of the right shoulder. (R. 119).

On September 16, 2002, X-rays of the Plaintiff's right shoulder showed that it is within normal limits. (R. 118).

On November 12, 2002, Daniels went to the Emery Neuroscience Center where she was seen by Dr. Wade E. Emery, III. (R. 201-254). During this visit the Plaintiff complained of the following ailments: headaches, neck pain, middle back pain, low back pain, vision problems, numbness or weakness of the arms and hands, memory disturbance, speech difficulty and sleep disturbance. (R. 219). A Neurological Examination - Higher Cortical Functions Assessment revealed that the Plaintiff was awake, alert and attentive. She also had her long term memory but had short-term memory problems. The Plaintiff had poor verbal expression but excellent verbal reception and verbal written. (R. 235).

The Plaintiff returned to the Emery Neuroscience Center on December 5, 2002. (R. 171). Daniels had decreased cervical and shoulder range of motion. (R. 173). The Plaintiff indicated that she either was having difficulty or requires assistance in performing light housekeeping, vacuuming, cooking, "long distance" shopping, lifting, carrying groceries, reaching overhead, driving, dressing, sit to stand, car transfers and bed mobility. (R. 174). Daniels had decreased pain with medication, lying down, applying heat, and using a sauna or hot tub. (R. 174). The Plaintiff listed that she walks three times a week for exercise. Daniels also listed her leisure activities as roller skating, playing tennis, and traveling. (R. 175).

On December 6, 2002, Dr. Emery found normal brainstem auditory evoked potential testing.

4

(R. 163). On December 12, 2002, the Emery Neuroscience Center noted that the Plaintiff had reached her maximum medical improvement and discontinued her therapy. (R. 144).

On January 21, 2003, Dr. Emery completed a Maximum Medical Improvement/Permanent Impairment Determination Certification Form on behalf of Daniels for the purpose of Workers Compensation. (R. 32-33). Dr. Emery noted that the Plaintiff had a permanent impairment of the whole body equaling 20%. (R. 32). Additionally, Dr. Emery opined that the Plaintiff could sit, stand, and walk for an hour at a time without interruption, occasionally lift/carry up to 10 pounds, could not pull/push with either hand, however, is able to simple grasp with both hands, could not use either foot for repetitive movements, and should avoid bending, squatting, crawling, climbing, and reaching above shoulder level. (R. 33). Additionally, Dr. Emery noted that Daniels was moderately restricted to unprotected heights, being around moving machinery, exposure to marked changes in temperature and humidity, and fumes and gases; and mildly restricted to driving automotive equipment. (R. 33).

On March 21, 2003, April 14, 2003, May 12, 2003, and May 22, 2003, the Plaintiff was treated by Dr. Emery for migraine headaches, low back pain, neck pain, and depression. (R. 135-138).

On April 29, 2003, the Plaintiff sought care for complaints of her back, neck, right shoulder and ankle at Anesthesia Pain Care Consultants with Dr. Joel Salamon. (R. 269-271). Dr. Salamon gave the following assessment:

> 1. Low back pain with lower extremity radicular pain secondary to lumbar canal stenosis.
> 2. Myofascial back pain.
> 3. Neck pain secondary to C5-6 disk bulging.
> 4. Cervical myofacial pain.
> 5. Depression.

(R. 271).

On May 16, 2003, the Plaintiff was admitted at the Coral Springs Medical Center stating that she wanted to kill herself. (R. 90). The clinical impression was that the Plaintiff had major depression and suicide ideation. The Plaintiff reported chronic neck and back pain, however, her range of motion was found to be normal. (R. 91).

On June 4, 2003, the Plaintiff returned for treatment with Dr. Salamon in order to receive an epidural steroid injection. (R.267-268). Daniels returned to Dr. Salamon on June 12, 2003, for a follow up to her first epidural steroid injection. (R. 266). Daniels reported that she did not receive any significant improvement from the injection and a second epidural steroid injection was suggested. (R. 266). On July 2, 2003, the Plaintiff returned to Dr. Salamon for a second follow up to the first epidural steroid injection. (R. 265). The Plaintiff reported that the injection "definitely seemed to help the pain on the right-hand side." (R. 265). Dr. Salamon opined that the Plaintiff was doing fairly well and he believed she should receive a second epidural steroid injection. (R. 265).    On July 31, 2003, Dr. Salamon administered a second epidural steroid injection to the Plaintiff. (R. 263-264). During a follow up visit to Dr. Salamon on August 6, 2003, the Plaintiff reported that her pain had been reduced and she had been more active around the house and in general. (R. 262).

On August 7, 2003, at the request of the Office of Disability Determinations, the Plaintiff was evaluated by Dr. Luis R. Zaldivar, a clinical psychologist. (R. 274-277). Dr. Zaldivar reported that the Plaintiff was,

> alert, attentive, responsive, and full oriented. Rapport was readily
> established. She answered all questions relevantly, maintained eye
> contact and seemed able to engage in conversation.

(R. 275). Daniels had a full scale IQ score of 79, which placed her in the high end borderline range. The Plaintiff also received low average functioning score in the auditory, visual, and tactile areas. (R.

6

276). Dr. Zaldivar also found that the Plaintiff's memory was in the borderline range but not impaired. He opined that her psychological symptoms appear consistent with the "diagnosis of (300.4) Dysthymic Disorder and (V62.89) Borderline Intellectual Functioning." Dr. Zaldivar concluded that the Plaintiff would benefit from psychiatric treatment. (R. 277).

On September 10, 2003, the Plaintiff returned to Dr. Salamon complaining of increased pain on her right side, due to increased work around the house. (R. 261). Dr. Salamon also included in his notes that the Plaintiff was, "in the middle of mediation to try and close her case". (R. 261).

On November 6, 2003, Dr. Salamon recommended that the Plaintiff undergo a sacroiliac joint injection as her pain had not resolved. (R. 260). On November 19, 2003, the Plaintiff received a sacroiliac joint injection. (R. 258-259). The Plaintiff returned to Dr. Salamon on December 4, 2003 for a follow up visit. (R. 256-257). Daniels reported that the epidural injections were more effective than the sacroiliac joint injection. (R. 256). A physical examination revealed moderate tenderness to palpation in the right lumbar paraspinous musculature in the area of SI, L5-S1 and L4-L5. (R. 256).

On December 9, 2003, the Plaintiff was seen for a consultative examination by Dr. William W. Cheatham of Family Medicine and Healthcare. (R. 278-280). The Plaintiff's vision tested at 20/20. (R. 279). Dr. Cheatham opined that the Plaintiff had chronic neck and back pain, cognitive delay - memory loss and confusion, acute psychotic disorder Hx of a closed head injury, and depression. (R. 280). Dr. Cheatham provided the following clinical impression:

> Reportedly, this patient is unable to work secondary to chronic neck pain, back pain and memory loss. The patient asserts that she was formerly a business owner and refuses to allow "all this bring her down." It was difficult gathering useful information from the patient. The patient appeared confused during the medical disability evaluation. The conversation was often illogical and erratic at times. Medical staff asserted that the patient behaved normally while in their care. Medical staff asserted that conversation with the patient was

7

fluid and logical. Medical staff asserted that the patient exhibited no abnormal behavioral signs. It appears that the patient behaved differently when alone with the evaluating physician. This behavioral inconsistency should be evaluated regarding the veracity of the patient's claims. The patient's neurologist should be consulted regarding the patient's typical behavior. The patient must be evaluated by a psychiatrist for disability determination. The patient was advised to follow up with a primary care doctor. The patient appeared to have acknowledged and understood all matters discussed.

(R. 280).

On December 30, 2003, Dr. David Guttman completed a Physical Residual Functional Capacity Assessment. (R. 282-289). Dr. Guttman reported that the Plaintiff could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand, walk and/or sit for about 6 hours in an 8 hour work day; and had an unlimited ability to push/pull. (R. 283). No postural, manipulative, visual, communicative or environmental limitations were noted. (R. 284-286).

On February 10, 2004, the Plaintiff returned to Dr. Zaldivar for a second psychological assessment. (R. 272-273). Dr. Zaldivar reported that the Plaintiff's speech was clear and fluent; that she was alert, attentive, responsive, and fully oriented. (R. 272). Dr. Zaldivar opined that the Plaintiff answered all questions relevantly and that her thinking was goal-oriented, logical, and coherent. (R. 272). The report also stated that the Plaintiff, "appears able to take care of her activities of daily living and finances." (R. 273). He concluded that Daniels' "presentation appears consistent with the diagnosis of (300.4) Dysthymic Disorder and (V62.89) Borderline Intellectual Functioning. She'd benefit from continued psychiatric treatment." (R. 273).

On February 12, 2004, the Plaintiff returned to Dr. Salamon for a check up. (R. 255). At that time, she reported that she was placed on a Duragesic patch and was doing very well, and her pain was under control. (R. 255).

8

On September 29, 2005, Dr. Emery completed a physical capacity statement in which he opined that, "[the] patient suffers from a disc bulge at C5-6, peripheral neuropathy, central canal narrowing at L2-3, L3-4, degenerative lumbar disc desiccation, migraine headaches, panic disorder, depression, memory disorder." (R. 338-340). He also assessed that the Plaintiff was limited to lifting 10 pounds; stand and/or walk less than an hour; sit 6 hours with alternating sitting, standing, and walking. (338-340). He opined that the Plaintiff could never climb or balance; occasionally stoop, crouch, kneel or crawl; and that her ability to reach and push/pull would preclude her from working around heights, moving machinery and vibration. (R. 338-340).

The Plaintiff continued to see Dr. Emery between June 29, 2004 through September 6, 2005. (R. 343-558). Progress notes from September 6, 2005 indicate that the Plaintiff had reached her maximum medical improvement. (R. 343). A Neurological Examination showed that the Plaintiff was awake, alert, and attentive. (R. 346). The same examination revealed no problems with long term memory, but deficiencies with short term memory. (R. 346).

On October 14, 2005, the Plaintiff visited Dr. Tannenbaum. (R. 342). During this visit the Plaintiff reported that Avinza was controlling her pain, that she was feeling better overall, and that she was once again able to wear heals. Dr. Tannenbaum opined that the Plaintiff had cervical and lumbar myofacial based pain, diffuse degenerative disc disease and remained at maximum medical improvement. (R. 342).

On January 5, 2006, the ALJ issued a decision finding that the Plaintiff's impairments of lower back pain, neck pain, shoulder pain, headaches and depression were severe but did not meet or equal the severity in the listing of impairments. (R. 6H-6X). The ALJ also found that the Plaintiff's allegations concerning her limitations were not totally credible. (R. 6W). According to the ALJ, the

9

Plaintiff retained the residual functional capacity for essentially a medium exertional activities. (R. 6W). Based on these findings, the ALJ concluded that the Plaintiff could perform a wide range of medium work and was not disabled. (R. 6X).

## II. LEGAL ANALYSIS

Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. section 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Kelley v. Apfel, 185 F.3d 1211, 1213 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

In determining whether substantial evidence exists, the court must scrutinize the record in its entirety, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995); Lamb v. Bowen, 847 F.2d 698, 701 (11th Cir. 1988). The reviewing court must also be satisfied that the decision of the Commissioner correctly applied the appropriate legal standards. See, Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987). The court may not reweigh evidence or substitute its judgment for that of the ALJ, and even if the evidence preponderates against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence. See, Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Baker v. Sullivan, 880 F.2d 319, 321 (11th Cir. 1989).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the conclusions of law found by the Commissioner, including the

10

determination of the proper standard to be applied in reviewing claims. Brown v. Sullivan, 921 F.2d 1233, 1236 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). The failure by the Commissioner to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal. Cornelius v. Sullivan, 936 F.2d 1143, 1145-1146 (11th Cir. 1991); See also, Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. See, 20 C.F.R. section 404.1520; 20 C.F.R. section 416.920 (a)-(f).

The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry ends. 20 C.F.R. section 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If such a finding is not made, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. section 404.1520(c).

At step three, the ALJ compares the claimant's severe impairments to those in the listing of impairments. 20 C.F.R. section 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. See, Gibson v. Heckler, 762 F.2d 1516, 1518, n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. 20 C.F.R. section 404.1520(d).

Step four involves a determination of whether the impairments prevent the claimant from performing his or her past relevant work. If the claimant cannot perform his or her past relevant

11

work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show, at step five, that there is other work available in the national economy which the claimant can perform. 20 C.F.R. section 404.1520(e)-(f).

The claimant bears the initial burden of proving that she is unable to perform previous work. See, Barnes v. Sullivan, 932 F.2d 1356, 1359 (11th Cir. 1991). The inability to perform previous work relates to the type of work  performed, not to merely  a specific prior job. See, Jackson v. Bowen, 801 F.2d 1291, 1293 (11th Cir. 1986).

In the present case, the ALJ found, that based on the record in its entirety, the Plaintiff retained the residual functional capacity for work that exists in significant numbers in the national economy and was not under "disability" as defined in the Social Security Act at any time through the date of the decision as defined by 20 CFR § 404.1520(f). (R. 6W). In making his decision, the ALJ gave little weight to the Plaintiff's treating physician, Dr. Emery. In her first argument, the Plaintiff contends that the ALJ erred by failing to give proper weight to the opinion from Dr. Emery, the Plaintiff's treating physician.

The opinion of a treating physician is entitled to substantial weight unless good cause exists for not heeding the treating physician's diagnosis. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  Good cause has been seen when the treating doctor's opinion was not bolstered by the evidence; the evidence supported a contrary finding or the opinion was conclusory or inconsistent with the physician's own medical records. If the ALJ disregards the opinion of a treating physician, the ALJ must clearly articulate his reasons. See Phillips v. Barnhart, 357 F.3d 1232, 1240-1241 (11th Cir. 2004).

In the decision, the ALJ recounted the record and opinion from Dr. Emery, specifically the

12

September 29, 2005 Medical Assessment which stated:

> On September 29, 2005 Dr. Emery completed a Medical Assessment of Ability to Do Work-Related Activities and indicated that the claimant suffered from a disc bulge at C5-6, peripheral neuropathy, central canal narrowing at L2-3, L3-4, degenerative lumbar disc desiccation, migraine headaches, panic disorder, depression, and memory disorder. He said that she could lift up to 10 pounds frequently, stand and walk less than one hour on an intermittent basis, alternating sitting, standing and walking frequently, and sit up to six hours in an 8-hour day. She should never climb or balance and could occasionally stoop, crouch, kneel and crawl occasionally. He indicated that her ability to reach and push/pull was affected by her impairments. The doctor also indicated that the claimant should avoid heights and moving machinery (Exhibit 14F).

(R. 6Q).   In finding that Dr. Emery's opinion held little weight, the ALJ reviewed records of the

Plaintiff's other medical records:

> The undersigned, when evaluating this opinion by Dr. Emery of the claimant's assessed limitation, finds his statements are not consistent with the other evidence of record and his own progress notes, which do not show any such limitations mentioned. In December 2002 the claimant told Dr. Emery that she took only over-the-counter pain relievers and was driving, exercising, walking, and for leisure activities, enjoyed roller skating, playing tennis and traveling (Exhibit 3F, page 51). In January 20, 2004 she reported that she was going to real estate school (Exhibit 3F, page 3). Dr. Salamon, on February 12, 2004, noted she was doing very well on a Duragesic patch, which had her pain under pretty good control (Exhibit 4F, page 1). The lumbar MRI in August 5, 2005 indicated only mild degeneration and no herniation (Exhibit 12F). In October 2005 Dr. Tannenbaum noted that Avinza was very effective in controlling her pain, she slept better, was able to wear heels, and felt better overall. She moved considerably better than before (Exhibit 15F, page 2). The undersigned finds that the September 29, 2005 assessment by Dr. Emery is not consistent with the medical record as a whole and, and is therefore given little weight.

(R. 6Q).

As noted above, the ALJ specifically discussed legitimate reasons in giving less weight to Dr.

Emery's opinion. The ALJ found that Dr. Emery's assessment which was provided on September 29, 2005 was not consistent with the evidence in the record or Dr. Emery's own progress notes. Specifically, the ALJ stated in his opinion that Dr. Emery's medical notes did not show the limitations he placed on the Plaintiff in his assessment, and are inconsistent with the other evidence of record. The ALJ did not only consider the consultative physician reports in making his determination, he also relied on the inconsistences between the Plaintiff's other treating physicians in giving Dr. Emery's opinion little weight. Namely, the ALJ pointed towards the evaluations of Dr. Salamon, Dr. Tannenbaum, and MRI results in determining that Dr. Emery's assessment was inconsistent with the record as a whole. (R. 6Q).

In sum, the ALJ reached his conclusion to give the assessment prepared by Dr. Emery little weight as the assessment was in conflict with his own treatment notes, the Plaintiff's testimony and the findings of the Plaintiff's other treating physicians and consultative doctors. If the Commissioner's decision is supported by substantial evidence we must affirm, even if proof preponderates against it. Miles v. Chater, 84 F. 3d 1397, 1400 (11th Cir. 1996).

It is the opinion of this Court that the ALJ clearly articulated his reasons for finding that the opinion of Dr. Emery be given little weight. The decision of the ALJ is supported by the substantial evidence contained in the record. This Court finds no basis for reversal as to the Plaintiff's first argument. Accordingly, it is the recommendation of this Court that the decision of the ALJ be affirmed on this basis as the decision of the ALJ is based on the substantial weight of the evidence.

The Plaintiff's second point of contention is that the ALJ did not properly evaluate the Plaintiff's severe memory impairment. The ALJ evaluated four different areas of function in determining the Plaintiff's mental residual functional capacity. In accordance with 20 CFR 404.1521

14

and SSR 96-8p, the ALJ looked at the Plaintiff's ability to understand, to carry out and remember instructions, use judgment in making work-related decisions, respond appropriately to supervision, coworkers, and work pressures in a work setting and deal with changes in work setting. (R. 6T). In order to properly evaluate the Plaintiff's mental ability to do these basic work activities, the ALJ evaluated four areas of function in accordance with 20 CFR 404.1520a and 416.920a.

The ALJ concluded that the Plaintiff had the ability to do basic work activities. (R. 6T). He pointed to the evidence in the record which demonstrated that the Plaintiff was able to take care of her own personal care, drive, and do several household chores such as cooking and shopping. Based on the Plaintiff's ability to do so the ALJ determined that the Plaintiff maintained no more then a moderate degree of limitation in maintaining activities of daily living. (R. 6T).

The ALJ then evaluated the Plaintiff's ability in "social functioning." (R. 6T). He determined that based on the fact that the Plaintiff got along well with her family and remarried, did not have difficulty relating to physicians and other health care workers, and took a real estate course, the Plaintiff only had a moderate degree of limitation in her ability to maintain social functioning.

Additionally, the ALJ then considered "concentration, persistence and pace," and made the following conclusion:

> Dr. Zalidvar, in August 2003, indicated that her memory was within the borderline range but not impaired and she took care of her own activities of daily activities and drove (Exhibit (Exhibit 5F, pages 3-6). In February 2004 Dr. Zaldivar indicated that her concentration, memory and judgment seemed adequate (Exhibit 5F, pages 1-2). In February 2004, she told Dr. Emery that Zoloft was working well (Exhibit 3F, page 2 and 4F, page 1).

(R. 6U). Based on the foregoing the ALJ determined that the Plaintiff had no more than a moderate limitation in her ability to maintain concentration, persistence and pace.

15

Lastly, the ALJ analyzed episodes of decompensation. (R. 6U). The ALJ determined that the Plaintiff experienced one such episode in May 2003 when she was hospitalized.

Further, In June 2002 a CT scan of the Plaintiff's brain was normal. (R. 112). An examination performed in December 2002, showed only a mild impairment. (R. 152). Moreover, Dr. Zaldivar noted that the Plaintiff's memory, while in the borderline range, was not impaired (R. 277).

It is the opinion of this Court that the ALJ properly considered the Plaintiff's alleged memory impairments. As such, this Court finds no basis for reversal as to the Plaintiff's second argument. Accordingly, it is the recommendation of this Court that the decision of the ALJ be affirmed on this basis as the decision of the ALJ is based on the substantial weight of the evidence.

The Plaintiff's third point of contention is that the ALJ's credibility determination is not grounded in the evidence. It is well established that pain alone can be disabling. Walker v. Bowen, 826 F. 2d 996, 1003 (11th Cir. 1987). However, the claimant's testimony of pain or other subjective symptoms standing alone, are not conclusive evidence of disability. See, Macia v. Bowen, 829 F. 2d 1009, 1011 (11th Cir. 1987).

In determining whether the Plaintiff suffers from disabling pain; the following test must be satisfied:

> [T]o establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

Lamb v. Bowen, 847 F. 2d 698, 702 (11th Cir. 1988). In the instant case, the first prong of the Lamb test was satisfied. The ALJ found that the Plaintiff suffered from lower back pain, neck pain,

16

shoulder pain, headaches and depression all severe physical impairments. (R. 6W). The analysis then shifts to the second prong of the test. Disabling pain could be shown in one of two methods. One, by objective medical evidence confirming the severity of the alleged pain or by showing that the underlying objectively determined medical condition is of a severity which can reasonably be expected to give rise to the alleged pain. Lamb, at 702.

Once the ALJ determined that the objective medical evidence did not confirm the severity of the Plaintiff's alleged pain he must then look towards the Plaintiff's subjective complaints and determine whether they can reasonable be expected to produce the alleged pain. "Whether or not the condition could be expected to give rise to the complained of pain is a question of fact subject to the substantial evidence standard of review." Lamb, at 702, citing to, Hand v. Heckler, 761 F. 2d 1545, 1549 (11th Cir. 1985); Boyd v. Heckler, 704 F. 2d 1207, 1209 (11th Cir. 1983).

The credibility of the Plaintiff's testimony must also be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain. Lamb, at 702. If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. Wilson v. Barnhart, 284 F. 3d 1219, 1225 (11th Cir. 2002). Failure to articulate the reasons for discrediting subjective testimony requires as a matter of law, that the testimony be accepted as true. Id.

First, the ALJ reviewed the Plaintiff's testimony:

> The claimant testified that the pain in her back goes down her right leg and she can sit for 30 minutes and then shift position. She can stand for 30 minutes and then her back hurts. She also said that standing is harder for her to do and walking is "not good". She related that she does water aerobics in the pool to help with pain. She stated that she can walk some and can lift and carry about 10 pounds. However she can not do any bending, kneeling or stooping, and she does not do any household chores or laundry. This is done by outside help and her

17

husband.

> When asked about her daily activities, the claimant testified that she lies in bed, goes into the living room, feels depressed, and watches television most of the day. She can drive to the store, but said that she gets lost. In response to additional questions about how long a period of time she could walk, the claimant said 30 minutes. She drives once or twice a week and drove herself to the hearing. She said that she could not push and pull due to her lower back. She also said that she did not socialize or take trips. On March 8, 2003, the claimant's husband reported that she prepared her own meals with help and did regular grocery shopping (Exhibit 3E, page 1).

(R. 6R-6S).

The ALJ then reviewed the record in order to determine the validity of the Plaintiff's subjective complaints:

> The claimant did not indicate any other treatments or measures she used to relieve symptoms and the record identifies no other factors concerning the claimant's functional limitations and restriction due to pain, poor memory or other symptoms. While the claimant might have some pain and discomfort at times, as well as depression, the totality of the evidence in the record does not persuade the undersigned that she is precluded from all types of work activities. After her fall in June 2002, Dr. Haimes recommended physical therapy. The cervical MRI did not show herniation (Exhibit 2F, page 5). In December 2002 the claimant told Dr. Emery that she took only over-the-counter pain relievers and was driving, exercising, walking, and for leisure activities, enjoyed roller skating, playing tennis and traveling (Exhibit 3F, page 51). The EEG on December 12, 2002 was normal (Exhibit 3F, page 23). After May 2003, she did not make any additional suicide attempts (Exhibit 1F, pages 1-16). Dr. Zalidvar, in August 2003, indicated her memory was within borderline range but not impaired. She took care of her own activities of daily activities and drove (Exhibit (Exhibit 5F, pages 3-6). In December 2003 Dr. Cheatham pointed out that she behaved normally with staff but not with him, and that this behavioral inconsistency should be evaluated regarding the veracity of her claim (Exhibit 6F). She told Dr. Emery, on January 20, 2004 that she was going to real estate school (Exhibit 3F, page 3). In February 2004 she told Dr. Zaldivar that she broke up with her husband. She cooked, took care of her own needs and finances, and was not suicidal. Her concentration, memory and

18

judgment seemed adequate. (Exhibit 5F, pages 1-2).

(R. 6S). The ALJ continued looking towards the medical record in order to evaluate the Plaintiff's

credibility:

> Dr. Salamon, on February 12, 2004, noted she was doing very well on
> a Duragesic patch, which had her pain under pretty good control. On
> February 23, 2004, she told Dr. Emery that Zoloft was working well
> (Exhibit 3F, page 2 and 4F, page 1). In December 2004 Dr. Emery
> noted the claimant's complaint that sitting a chair for a long time in
> real estate school aggravated her condition (Exhibit 16F, page 88).
> The lumbar MRI in August 5, 2005 indicated only mild degeneration
> and no herniation (Exhibit 12F). In September 2005 Dr. Tannenbaum
> indicated that the claimant moved around adequately well, her gait
> was non-antalgic, and she was told to start an exercise
> program(Exhibit 13F). In October 2005 Dr. Tannenbaum indicated
> the Avinza was very effective in controlling her pain, she slept better,
> was able to wear heels, and felt better overall. She moved around
> considerably better than before, her affect was much more positive,
> and her gait was not really all that stiff (Exhibit 15F, page 2).

(R. 6S). In the instant matter the ALJ specifically stated his reasons for rejecting the Plaintiff's

testimony. (R. 6S). The ALJ discussed the symptoms and limitations which the Plaintiff claimed to

have and then compared them to the evidence contained in the record. (R. 6S-6T). Based on this

analysis the ALJ determined that the Plaintiff's allegations of pain were out of proportion to clinically

substantiated impairments. (R. 6S). A clearly articulated credibility finding with substantial

supporting evidence in the record will not be disrupted by a reviewing court. Foote v. Chater, 67 F.

3d 1553, 1562 (11th Cir. 1995).

As the ALJ clearly articulated his reasons for finding that the Plaintiff's testimony lacked

credibility, it is the opinion of this Court, that the decision of the ALJ is supported by the substantial

evidence contained in the record. This Court finds no basis for reversal as to the Plaintiff's third

argument. Accordingly, it is the recommendation of this Court that the decision of the ALJ be

affirmed on this basis as the decision of the ALJ is based on the substantial weight of the evidence.

As detailed above, this Court finds that the ALJ did not commit error in the evaluation of the treating psychiatrist's opinion, did properly evaluate the Plaintiff's memory impairment and did properly make a credibility evaluation of the Plaintiff. Thus, it is the recommendation of this Court that this cause be affirmed as the Court finds no basis for reversal.

## III.  CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court finds that the decision by the ALJ is supported by substantial evidence and the correct legal standards were not applied. Accordingly, it is the recommendation of this Court that the Motion for Summary Judgment filed by the Plaintiff (D.E. #14) be **DENIED**, the Motion for Summary Judgment  filed by the Defendant (D.E. #17) be **GRANTED** and the decision of the Commissioner be **AFFIRMED**.

Pursuant to Local Magistrate Rule 4(b), the parties have ten (10) days from service of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Alan S. Gold, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. Loconte v. Dugger, 847 F.2d 745, 750 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988); R.T.C. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE AND ORDERED** this _____**11**_____ day of February, 2008.

ROBERT L. DUBÉ
UNITED STATES MAGISTRATE JUDGE

cc:    Honorable Alan S. Gold
       Charles S. White, AUSA
       Lilli W. Marder, Esq.

20